Before we begin our official session this morning, I have a motion I would like to make, and for that purpose I will turn over the presiding gavel to my colleague, Judge Pearls. Well, with that gavel, I'm happy to recognize you, Judge Lang. Very good. I have the pleasure this morning of moving the admission of one of my law clerks, Jacob Schroeder. Jacob has been with me for a little over a year and has done outstanding work. He has made a tremendous contribution to the work of my chambers and to the work of this court. I'm very proud of what he has accomplished, and I know he's going to do quite well in practice. I'm delighted to make this motion. I move the admission of Jacob Adam Schroeder, who is a member of the Bar and Good Standing of the Highest Courts of California and the District of Columbia. I have knowledge of his credentials and am satisfied that he possesses the necessary qualifications. With the concurrence of Judge Moore, I presume I wholeheartedly grant the motion. I want to turn to our clerk. Please raise your right hand. I solemnly swear and affirm that you will support yourself in adjourning counsel of this court, uprightly according to law, and that you will support the Constitution of the United States of America. I do. Congratulations, and welcome to the Bar of the United States Court of Appeals. All right. The first case is Appeal Number 2011-1144, Neutral Tandem versus Peerless Network. Mr. Harrington, good morning. Good morning, Your Honor. Thank you, Your Honor. May it please the Court, John Harrington for Neutral Tandem. I'd like to focus on two points this morning. First, I'll address the district court's finding that the Wiley patent anticipates the limitation in the 708 patent requiring disclosure of the network and methods for managing the efficient routing of transit traffic between said tandem access points and said switch. And then second, I'd like to make sure to address our argument regarding certain of the dependent claims in the patent, in particular claims 10, 19, and 23, as well as 4 and 14. We believe that even if the court does not agree with our primary argument, there's an independent basis for reversing or vacating the decision as to those claims. You're not making any argument with respect to the other dependent claims. Is that correct? Not other than to the extent that our primary argument is applicable to all claims because the limitation appears in all the claims. With respect to our primary argument, I think the best way to understand what we believe is the district court's error here is to lay its claim construction ruling side by side with its summary judgment ruling. At claim construction, which appears at page 15 of the joint appendix, volume 1 of the separate appendix, the district court construed the limitation network and methods for managing the efficient routing of transit traffic between said tandem access points and said switch to include a requirement to manage traffic into, out of, and throughout the claim network. That analysis appears at page 15 of the appendix. But then at summary judgment, the analysis that appears at page 37 of the appendix, which is attached to our primary brief, you'll see that the district court, in analyzing Wiley, did not consider whether Wiley discloses a network or methods for managing the efficient routing of transit traffic between said tandem access points and said switch. Instead, what the district court found is that Wiley discloses the limitation solely because it discloses reducing reliance on the ARBOC network. That, we believe, is a fundamental error because, in fact, the record shows that Wiley does not disclose a network or methods for managing transit traffic into, out of, or throughout the claim network. I think the best way to understand that is actually to look at the diagrams that are in Peerless' response brief. They illustrate the networks and, to some extent, the methods at issue. They're on pages 19 and 20 of Peerless' brief. If you see on page 20, I don't know if your honors have copies of the brief handy, but I do think it's the best way to sort of illustrate the problem we have here. The 708 patent is depicted on page 20, and the Wiley network is depicted on page 19. Let's start with the 708 patent, if we can. You'll see on the left and right-hand side, it's not numbered. Unfortunately, it wasn't numbered in the drawings. But on the left and right-hand side, you'll see green boxes. Those are switches. Those are switches of originating and terminating carriers. Those are the carriers that serve either the party that makes the phone call or the party that receives the phone call. In between those two switches is the network of the 708 patent. It's made up of the tandem access points, which are the pink lines between the green switches and the yellow boxes. The yellow boxes are the switches or the distributed switches within the network. And the blue links within the network are basically the transport within the network. That makes up the 708 patent. So to transport traffic into, out of, and throughout the claimed network means you have to take the traffic from the green switch at the point at which it enters the network, which is the tandem access point, the pink line. And let me give you a more specific example, Your Honors. If you look at the CLEC class 45 at the top left-hand corner of the depiction, CLEC is a competitive local exchange carrier. That's one of the carriers. If that CLEC wants to make a call, a customer of that CLEC wants to make a call that's destined for the green switch on the top right-hand side that says location number one, the disclosures in the 708 patent require taking that traffic from the green switch along the tandem access point, which is the pink line, into the yellow switch and ultimately taking that traffic along the blue line through the other switch and then out to the green switch on the other side. Can I just shortcut the argument a little? Yes. Okay, so I'm looking now for comparison purposes, which is where you were going ultimately, to figure one Wiley. Yes. And it seems to me that under the Wiley network, you can exchange traffic between any two carriers, right, the CLEC. Traffic can go from one CLEC box to another CLEC box and from one of the CLEC boxes to an IXC box without passing through the, you know, baby bell, the regional bell network. Why isn't that sufficient? Firstly, do you agree with that, my reading of this figure? And secondly, why isn't that sufficient to satisfy the claim limitation we're talking about? I agree that Wiley can be used for that. I would say that Wiley does that. It can be used for that process. And I don't agree that it satisfies the claim limitation in its entirety. So what is missing? Tell me exactly. Managing the traffic into, out of, and throughout the claim network. And I can give you a specific example, Your Honor, if you turn to Wiley on page 19. But let me just put this out and then you can answer. But the claim limitation that you spoke about and the claim construction that nobody's challenging the district court gave was traffic out of, throughout the claim network by reducing customers' carriers' reliance on the regional bell network. So that's part and parcel of that. It's not just out in ether that they transmit traffic. It's in order to reduce reliance on the regional bells. And that's part of my concern. I see Wiley doing that. And I'm not sure why it doesn't. I think your question sort of turns on the word by, to some extent, Your Honor. The question is, does reducing reliance on the ARABAC network, is that all that's required? And as we've argued in our brief, when you read the claim construction process, this into, out of, and throughout the claim network was a disputed issue at claim construction. We specifically argued that you have to disclose managing it into, out of, and throughout the network. Peerless specifically argued that you don't have to do that. And the district court agreed with our construction. What Wiley doesn't do that doesn't meet that construction is manage the traffic into the network. Why is that? I think that's what Judge Gross is getting at, and I have the same question. Why does Wiley not show that it manages the traffic into, through, and out? In fact, Wiley, I would argue the picture shows the network, but the specification of Wiley makes clear it's actually the opposite. If you look at the pink tandem access point, number 160, on the top, if we look at, if we start with CLEC 158, I believe it is, in the top left-hand corner of the Wiley network, you'll see that there's a relatively small, broad, 160 tandem access point. Yes. Do you see that here? Into the broadband interface, which is, I believe, 114. Column 11 of Wiley, page 6871 of the separate appendix, makes very clear that the CLEC is responsible for transmitting its own traffic into the Wiley network. Do you want to tell us what lines on column 11 are? I believe it's lines 9 through 12, but let me, if I may, Your Honor, have it. That says the CLEC transports calls. I'm on column 11 of Wiley, beginning at, I believe, line 7. The system of figure 1, which is what's on page 19, operates as follows for a call that is transported between the CLEC 158 and the ILEC 154. Those are the two on the top, through a sonnet ring. The sonnet ring is the Wiley ring. The CLEC 158, and this is important, the CLEC 158 transports call signaling to the signaling processor 104, that's the processor in the middle, over the link 174, and transports user communications in a TDM format to the fifth broadband interface 114, that's the yellow broadband interface at the top left-hand corner, over the connection 160. So the difference is Wiley doesn't manage the traffic into the network. What Wiley is, is essentially, and this is all in our expert's report and declaration. I mean, we're here on summary judgment of anticipation. There were disputed expert issues on this, but what Wiley is, is essentially a ring. It's a network. At that point, why don't you go further down that column 11. Maybe I'm mixing apples and oranges. Yes. Where it says, look at the beginning on, I guess, line 50 through 55, that paragraph, 56. Doesn't that, I mean, they talk about, it's appreciated that a call may be connected, da, da, da. In fact, a call may be connected between any of the elements in the broadband system 102. Why doesn't that sort of get to the heart of what you're talking about? It's because it doesn't manage the traffic, Your Honor. Here's an example. Alternative tandems, this is all part of the record, were known in the art. So you could have just stuck a tandem switch in the middle, had two companies plug into it, and a call can be completed and reliance can be reduced on the ARBOC network that way because you're substituting a tandem switch in for another tandem switch. That's old in the art. There's no dispute about that. PTO recognized that at the time of the patent. What wasn't old in the art, what's new in the 708 patent, is taking the traffic all the way from green switch to green switch. That's what Wiley doesn't disclose. So to simply say a call may be completed in Wiley certainly isn't, we would argue is not disclosure of Wiley managing the traffic into the network. Is that the end-to-end position that the briefs go back and forth on, on whether or not you're trying to impose that limitation on the claims, which is not what you asked for in claim construction? But the end-to-end thing, is that the point you're making? It's similar to, Your Honor, and as I've gone back through the brief, it's really a two-step analysis to get to end-to-end. End-to-end is the language that was in the prosecution history. When you go back and you see what caused the patent to be granted, at the end of the day, both sides have cited this. You have the discussion by the inventor of what's new in the art is the network that the inventor described as delivering it on an end-to-end basis. And that's in the prosecution history. The examiner did not require that the claim language be amended to include the words end-to-end. What do you make of that? What I make of it, Your Honor, is that what was added to capture that concept is the language we're relying on. It's in, I believe, it's in the background section of our brief. You'll see we've underlined, when we describe the history of the addition of language to the claim, the addition. I understand what you're referring to, and I've read all of that. It just strikes me as quite odd, and I'm not sure what to make of the fact that there's an argument that, oh, the claim really is, the invention is patentable because it provides end-to-end communication, and the examiner says, terrific, I'm going to allow it. And instead of the claims being amended to add that limitation, the claims are amended to add something else. What they were amended to add is managing the efficient routing of transit traffic, and this is the key language, between said tandem access points, which are the pink, and said switch. That's been construed as into, out of, and throughout the network. So it's a two-step analysis. The network goes from switch to switch, green switch to green switch, basically. So to manage the traffic into, out of, and throughout the network requires managing it from switch to switch. You could call that end-to-end management. I think that's functionally the same concept, but the specific language in the claim that captures that concept is managing the efficient routing of transit traffic between said tandem access points and said switch. That was the disputed issue in claim construction. On page 1182 of the appendix, you'll see in our claim construction brief that the parties dispute whether you have to manage traffic into, out of, and throughout the claim network. That was a disputed issue. PIRLA said you only have to manage the traffic within the network. That's the difference. That was the dispute. So you say that into, out of, and throughout the claim network is just another way of saying end-to-end. I think it captures the same concept, and I think when you look at the prosecution history, I'm sorry, when you look at the history of the claim construction proceedings here, you'll see that that's what's captured. It really doesn't, again, we're here on some... I want to touch on briefly, though. Oh, I'm getting into my rebuttal time. I apologize. We'll give you an extra minute or two. Just go ahead and comment on your dependent claims. The dependent claims, Your Honor, it's a pretty straightforward argument. The district court didn't address those arguments. There's at least a disputed issue of fact regarding, in particular, the concept of routing to an alternative tandem that can provide an alternative path for call completion. What Wiley shows is... Wiley doesn't disclose that. What Wiley discloses is routing to an alternative trunk group, but routing to an alternative tandem from a third-party network that can provide an alternative route to call completion is not disclosed in Wiley, and it's an important point. Did you make specific arguments supporting the patentability of those dependent claims in your motion? In the motion for summary. Judge, I know you referred to your expert, Dr. Brody. What we did, Your Honor, it's the northern district procedure. We noted the dispute. We referred to what's called the statement of material facts, and that in turn referred to specific parts of Dr. Brody's declaration. The point of those is to give the district court a road map for the arguments. In a nutshell, we did more than Peerless did. Peerless had one sentence. They had the movement. They had the burden of persuasion, at least, on summary judgment. They had one sentence that says all the dependent claims are also anticipated CR expert. We actually did more than that. We will reserve your rebuttal time. Let's hear from Mr. Gohannan. May I please report? Good morning. Good morning. I'm glad we're going to be talking about the figures. I actually have a copy from the record that has the two color networks on the same page. Are you comfortable flipping back and forth, or would you like me to hand up the page from the record that has them on the same page? I think we understand what we're talking about. Thank you, Your Honor. It's Peerless' position that neutral tandem has waived its right to appeal managing into, out of, and throughout claim limitation, as well as waived its right to argue that the dependent claims are separately patentable from the independent claims. Well, they haven't waived anything if Mr. Harrington is correct that into, out of, and throughout the claim network essentially means the same as end-to-end. So tell us why you disagree with that, if you do. Your Honor, neither end-to-end nor managing into, out of, or throughout is referenced in their summary judgment memorandum. They spend two and a half pages talking about Wiley and their summary judgment memorandum in this issue is not addressed. Well, what's the difference then between into, out of, and throughout the claim network and end-to-end? Why is it something less? My understanding from reading neutral tandem's brief is simply that end-to-end is a renaming of a claim construction that they got, and maybe it's a shorthand. The bottom line is end-to-end management in those terms was never advocated by neutral tandem as being a construction of the managing the efficient routing of transit traffic. Then why don't you focus on throughout the claim network, and Mr. Harrington's arguments weren't exclusively on end-to-end. Okay, I will, Your Honor. Referring to the figures, the flaw in neutral tandem's argument regarding managing into, out of, and throughout is revealed at page 19 of its reply brief, and it's there that neutral tandem states that, and I'm in the last paragraph on that page, second sentence, in the Wiley system, the originating carrier bears responsibility for managing its traffic from its own switch, depicted in green in Peerless' brief, along the tandem access points, depicted as magenta in Peerless' brief. The word along reveals the flaw. Tandem access points were construed by the district court to be exactly that, points of interconnection. You cannot transport along a tandem access point. It is a point, and what neutral tandem does is focus on the pink lines in the illustration of Wiley and the pink lines in the illustration of the 708 patent network as being more than points. The reason that they're pink lines is just for ease of illustration. The bottom line is tandem access points are just that. They're the point where the two carriers connect. It could be anywhere along that pink line where you have the point, where the actual facilities meet up. Can you point us to something other than attorney argument that tells us that in the specification and so forth, either in Wiley or in the neutral tandem? They describe this as magenta, I think, typically, but is that made clear, drawn out in any of the specifications? Yes, in the 708 patent, tandem access points are defined as element 41. There are illustrations in the record that include the reference numerals. Essentially, the patent application was filed without the reference numerals and they were later entered into the record, but they never made it into the patent. But there are illustrations that show that the tandem access points are right at, if you're looking at the 708 patent, if you see the small yellow file cabinet looking devices, those are identified as figure 11 of the 708 patent. It would be on page 20 of the peerless brief. Those are the tandem access points. They're right there. They're at the same edge of the 708 patent network as in the Wiley network. The tandem access points in the 708 patent are identified as element 41 at column 8, lines 66 to 67, and there's more discussion of that along the top of column 9. We'll have to find for you in the record where the figures are with the reference numerals. But element 41 is shown to be right at those yellow file cabinet looking devices. So the point is this. Wherever the two networks meet is by definition a tandem access point. It is at that point where the traffic comes into the Wiley network and is that point where the traffic must exit the Wiley network. In fact, during claim construction, the district court specifically noted when construing the managing the efficient routing of transit traffic term to include the managing transit traffic into, out of, and throughout language, that the term throughout is sufficiently broad to encompass into and out of. Therefore, if the district court finds that traffic goes throughout the Wiley network, it has satisfied this portion of the claim construction. And in fact, the district court did find that. If you turn to the last page of the district court's summary judgment opinion, it says in the second to last paragraph, each call routed through the Wiley system is a call less routed through the ILAP RBAC network. So right there, the district court has given the basis to find that Wiley satisfies that first portion of the claim construction of the managing the efficient routing of transit traffic. If I understood Mr. Harrington's argument, he was saying that the problem is that the SELEX do not manage the efficient routing. So even if there is traffic that flows through this system, it's not being managed. Your Honor, Wiley addresses this as well. At column 21 of Wiley, there is the beginning of a lengthy description of the Wiley call control manager. And that call control manager is described as carrying out a number of functions, and it goes on for pages, the discussion of the CCM, call control manager. One of them is to, quote, manage traffic, end quote. So there is no doubt that... What line are you referring to? Column 21, the line where it references managed traffic expressly is line 60. But I would refer to the full discussion because it describes other things that are essentially management. For example, in that same discussion, it controls routing and selects the actual connections. What about the dependent claims? Overflow capacity in particular, I'd like him to address. The district court didn't touch on the dependent claims at all. I disagree. I'm sorry, Your Honor. I disagree. I think the district court did at page 14 of its opinion in footnote 4. We've got the appendix. The appendix is A34, Your Honor. We're on A34? That's the page in the record that I'm referring to. And what are you referring to on that page? Footnote 4. Here, the district court reviewed Dr. Brody's declaration made in opposition to the motion for summary judgment. It seems to me this is in the context of the district court's examination of the independent claims. This doesn't address specifically the limitations that are contained in the dependent claims. The limitation that appears throughout in the independent claims that form the basis for the entire analysis. It does inherently because what the district court is saying is that based on what Dr. Brody has said, the single distinguishing feature for any of the claims is the managing the efficient routing of transit traffic limitation. That's not what Dr. Brody said in his declaration. He made specific reference to the dependent claims in arguing that the dependent claims are distinguishable from Wiley for a number of reasons. He did, and those statements are to some extent incongruous and in conflict with each other. I think the district court based on what... The district court didn't make any rulings to that effect, did it? It did not. Well, then what do we have to review then? You have the judgment... We can't make those rulings. I'm sorry, Your Honor. We can't make those rulings. With respect to the dependent claims? Correct. We can't make the rulings with respect to whether there's a genuine issue of material fact and whether Dr. Brody's declaration should be discounted or overlooked or ignored. We can't make that determination. And if the district court didn't do it, then are we left in a position where the only thing we can do is to send it back? No, Your Honor, but I think this case is much like the clock spring case that we cite in our brief, which is... But in that case, there was an acknowledgement that the claims all stand or fall together. Was there not? Yes, but the same fate applies to neutral tandem here based on the Malik case that we rely upon for our waiver argument. Neutral tandem did not address the dependent claims at all with respect to Wiley. It dedicated a half of one sentence and said, for numerous other reasons, the dependent claims are also distinguished from Wiley. But it relied on its expert, and the expert submitted claim charts that had some specific reference to each of the dependent claims. Is that right? Yes, but the Malik case does not condone that method of contesting a motion for summary judgment. The Malik case is very clear. It goes into details about not only responsive statements of facts that must be provided by the non-movement, but also says what must be in the memo itself, the memorandum. And it says the full 56.1 statements do not abrogate a party's obligation to recite its version of the facts in its supporting memorandum. It is inappropriate in one's memo to simply refer the court to the 56.1 statement. And the court continues later on. If we were to disagree with you and find that they properly preserved and raised the issue, maybe they didn't go into as much detail as we all would have liked, but that they properly preserved it, then what? I mean, the district court didn't address it, whether it's the overflow capacity limitation in one of the dependent claims or otherwise. Should we do that as a matter of first impression on appeal? No, I think that the district court adequately addressed Where? That footnote doesn't have anything to do with the overflow capacity. No, that footnote you're reading is an understatement. I mean, I think that the district court   I mean, I think that the district court adequately addressed the issue. If you accept all the premises, Your Honor, there's nothing left for me to argue. I agree. But the premises are that there was not a waiver, I believe, and the premises that footnote for is inadequate to dispense with the dependent claims. Peerless certainly feels differently. If those don't control, then yes, there's nothing left to review. What about in their responsive statement of facts? You don't think that's adequate to have addressed the issue and raised it for summary judgment purposes? No, I think when you the issue of waiver is not only a function of where, meaning the memo versus the statement of facts, but also what. When you drill down into the responsive statement, it really collapses into nothing more than a general denial by Dr. Brody that in his opinion Wiley doesn't disclose alternate routing. Yet when you compare the alternate routing as described in the 708 patent, which is illustrated in one figure, in figure 18 of the 708 patent, and it shows that the overflowed traffic goes from the 708 patent network to an RBOC and then on to another switch. Well, the Wiley network shows traffic that can go from the Wiley network to an ILEC or an RBOC, same thing, and that ILEC or RBOC is a tandem switch. It's described as being a tandem switch. So the ILEC in Wiley is necessarily connected to another switch. What about all this discussion on page 10805 of 911 emergency services? That's not them adequately raising some of the issues? No, Your Honor. I don't think that Dr. Brody can, it's reasonable for the district court to accept Dr. Brody's position there. Connection to 911 tandem services is admitted to be prior art in the 708 patent. It's illustrated in figures 5, 6, 7. In each of those labeled prior art, the 708 patent network is shown to, actually prior art network, I'm sorry, is shown to be connected to operator services tandems and 911 tandems and in fact the 708 patent says it was mandatory for carriers to connect to 911 tandems. What about in their brief when they say Dr. Brody and Dr. Starkley also dispute whether Wiley anticipates many other limitations and requirements for the independent claims as well as many of the dependent claims of the patent and then they cite specifically to the exhibits and specific paragraphs in the exhibits where those individuals go through each of those dependent claim limitations. Why isn't that enough? Again, Your Honor, I think when you drill down, I'm going to give me a break. But it also has a citation to the specific paragraphs in those expert reports that dispute individual limitations in the dependent claims. And when you go to those expert reports, there's little there other than a parroting of what is in Wiley and a denial by Dr. Brody that it constitutes that particular claim limitation. All right. I think we have your position, Mr. Your Honor. Thank you very much. Mr. Harrington. Mr. Hennon ran over by a little bit of time and we're going to restore your full rebuttal and that should even things. Thank you very much, Your Honor. I will be brief. On the issue of preservation of the issues in a way, and I think Your Honor's questions captured the heart of it, I would just point out that on the dependent claims in particular, the manner in which we raised and supported our arguments, both for the independent and on the dependent claims, is entirely consistent with the Northern District of Illinois practice and particularly with respect to the dependent claims, as we've pointed out in our brief, we actually developed that argument far more fully than peerless did. Did you think about going back to the district court and saying, wait a minute, you invalidated all these claims and you only dealt with the independent claims and we've got these dependent claims that you need to deal with? There's a reason... That's what it sounds like down in normal practice. I mean, assuming that we read the district court's treatment as you do in contrast to how the other side does. We thought it was more appropriate to take an appeal, and this gets in, actually, Your Honor, to the final argument we made in our brief, which I didn't necessarily address, but our request for a reassignment. You'll see some recitations in our brief of what I would call, having been trial counsel, displeasure, off-the-record expressions of displeasure by the district court regarding the fact that we were pursuing a preliminary injunction motion, things of that nature. This was all done off-the-record. You didn't ask for any kind of reconsideration because you didn't want to evoke his displeasure? How do you think he's going to feel about asking to disqualify him? He's not going to feel very bad if you give us a new judge. But assuming you don't, the reality... Your Honor, it put us in a very difficult position. It's an argument that on appeal we weighed raising, frankly, but I can tell you that from a lawyer's perspective, it's difficult when you're in court and you're repeatedly told to go off-the-record and told, for example, and this isn't refuted, I mean, I don't think the others will dispute this, that the judge doesn't want to rule on your motion because he has a Biden rule problem. That happened. It was off-the-record, but it happened. There were things of that nature. Our view is that the district court gave very, very short shrift to the entire summary judgment process because we wanted to get rid of the case, frankly. The judge told us, again, off-the-record that if we didn't withdraw a preliminary injunction motion that we had that we'd get a ruling by the end of the month, there'd be no more motions filed. Our view is that the judge gave this short shrift, and so we didn't think that would be appropriate. So you just thought it would be a waste of time? I would say a two-fold, Judge. I don't think it's necessarily, just from a pure legal perspective, I don't think it's a requirement to seek reconsideration, and under the circumstances presented here, where we do believe that we went into great detail and followed the Northern District's practices in supporting and debating each of these issues, to have gotten basically no consideration of those issues whatsoever, we thought the better approach would be to come before you on appeal. I'm sorry, I didn't mean to follow through. Oh, no, not at all, Your Honor. Unless Your Honors have any further questions, thank you very much. Thank you. The case is submitted. Thanks, both counselors.